All right, good morning, everyone. It's nice to be in person, albeit masked. So we have three cases on the argument calendar today and one case on submission. I'm told all lawyers are here, which is great. Normally, I would be checking to see if everybody's on Zoom and their sound is working, but everybody's here for this argument. So, Mr. Marengolo, you have reserved how many minutes for rebuttal? Three minutes. Three minutes for rebuttal. Okay. Thank you. Let's just give us one second. Okay. Mr. Marengolo, you may proceed. Thank you. Justices, we haven't been promoted yet. No, sir. Don't worry, Judge. Judge, you know, I understand from reporting of this case and the facts of this case are really bad. We never contested the sex trafficking on count eight of which Mr. English was convicted, but we are contesting count nine. And there are two problems that we're contesting. One is that there was no specific intent for him to commit the kidnapping. As the evidence in the record has shown, that the individual was brought to New York on her own free will. She comes to New York. She hangs out with Mr. English. We understand what he was about and what he was doing, but with respect to the kidnapping, there was no evidence in the record that could prove beyond a reasonable doubt that he was guilty of count nine. Specifically, no evidence that he restrained her, restrained her against, I'm not sure what you mean by that. He had a specific intent to restrain her. How specific does it have to be? She came here. She was hanging out with Mr. English for hours and hours. He had, he was voluntarily intoxicated. The record will show that he was, I guess, the counselor. I think what Judge LaValle is getting at is that he unloaded and loaded his car. He took a bath. He dumped her purse. He engaged in this kind of activity over four hours. How could a reasonable juror not conclude that he at least had enough presence of mind to be kidnapping her when he was able to do those amongst a whole series of other terrible things? Well, I think the evidence shows is that the kidnapping happened between a specific time and like you said, the four hours. But he was, he did take a bath. You know, he was obviously drinking and, you know, we're talking specifically here, Judge, and that's me not being clear and I apologize. I'm talking about his specific intent is men's right. The question is not whether he kidnapped her in having her come from New Jersey. That's not the issue. The government is no longer contending that that was the kidnapping. Judge, whether it's that he had the men's right to specifically intend to kidnap her within the four hours of which the evidence has shown he was, you know, intoxicated. He deleted text messages. He took a bath. He loaded and unloaded guns. Like, how does that not suggest at least enough presence of mind for a reasonable jury to conclude that he knew enough of what he was doing? Well, Your Honor, if he's taking a bath, that means he's actually in the bath, in the bathroom, and she would never restrain. She's never done it. She's never handcuffed. She's never, we're contesting partly, you know, that in that period of time, you know, she probably could have, you know, left. You know, she wasn't specifically kidnapped when he was in the bath. I mean, that's our argument there. In addition to that, you know, there's only one text message that the government relied on, and it's calling. I believe that's the only text message within the period of time, and that text message is extremely vague. What about, come now? Come now, that was prior to the kidnapping. That was, I believe, 10.06 p.m., and that was to his co-conspirator. But he also, prior to that, sent the text message that he did not like this individual who'd be Tatiana, you know. I'm not condoning any of this. Well, of course, you're not condoning, but I just want to understand your sense of the timeline. So your defense is voluntary intoxication, therefore no specific intent. I get that. But at what point did the kidnapping occur, in your mind? The kidnapping occurred in between, say, 10.06 and 2.30. That's probably the timeline that the kidnapping did occur. So sometime after the come now, or before the come now? After the come now. And what was the magic that happened at that point? Well, the testimony was that he was drinking, he was on drugs, and that he just changed as an individual, became irate, and held her at gunpoint. So part of the problem here, of course, is there was no voluntary intoxication instruction that was even requested, right? That is correct. We argue in our second to last point, point five, that the judge should have sua sponte given the jury a voluntary instruction in the jury charge. I'm very well aware that could be done under 2255, but that's what I argue in the reading. Okay. The next point I'd like to make quickly is that there is a jurisdictional, the element on 102A1, which requires you, in this particular case, to use the why as an inference of the kidnapping. The only text message in the period of time of the kidnapping was, call me. And that's a pretty vague text message. Or if we want to go before the kidnapping, come, you know, the come soon text message. She's going to you, some go soon. That was the other text message. So we respectfully submit that you can't have a federal kidnapping. We're not saying this is a state kidnapping. We're saying you can't have a federal kidnapping based on the whyers of these specific text messages. And I believe it's a seven-certification United States v. Plank that says... I'm sorry. And the reason we can't is you're saying it's because it's too vague? It's vague, yes. Call me doesn't, isn't, in our opinion, actually in our opinion, the call me text message isn't an inference of the kidnapping or part of the kidnapping. Well, I mean, it couldn't be inferred any number of ways, but isn't that fair ground for the, fair game for the jury to make, draw inferences, reasonable inferences from what might be a somewhat ambiguous phrase. It could mean a couple of things, but the jury gets to decide that, don't they? And that was argued to the jury in summations, right? Yes. That's all I have. The other issues rely on the papers. The final issue, Judge Garthie, who's, you know, who I've been before, a great judge, he didn't take into consideration the COVID. So we would like him to be re-sentenced based on the situation with the client being in the FCC and NBC with the COVID ranking. Okay, but just to be clear, the judge imposed a 25-year term of imprisonment on each count to run concurrently. Correct. So even if you win here on everything, he's still got a 25-year sentence. I don't think that is the case. Okay. All right. Thank you very much, Mr. Marengolo. You've got three minutes for rebuttal. We'll now hear from the government. Thank you, Your Honor. May it please the Court? I would just start by addressing the sufficiency of the evidence as to the specific intent here. Can I ask, before you do that, I'm sorry to interrupt, but you seem to be conceding that kidnapping is a specific intent crime, and yet there seems to be a bit of a split on this. And so I guess I'm a little curious as to why you're so confident that it is. Your Honor, I think in this particular case, given the jury instruction that was provided to the jurors, the jury instruction does seem to ask the jurors to consider whether or not the defendant has knowingly and intentionally and unlawfully conducted the kidnapping. And so in this specific context, given these jury charges, we are... Well, I guess I'm asking a different question. There's a statute here. And so it either is or isn't, I think, a specific intent crime. And so we might have to be asked to say whether it is or isn't. So is it or isn't it? I think what we argue about whether or not it's a specific intent is out of a bunch of caution. Even if there were a specific intent crime, there is nothing in the record to suggest that the defendant, that there is sufficient evidence to prove the specific intent. All right. So, I mean, is it fair to say, and I don't want to put words in your mouth, but what you're saying is that we needn't decide that because under either standard, the evidence was sufficient? Correct, Your Honor. Okay. All right. Go ahead. Start interrupting. And so there's nothing in this record to suggest that the defendant was so incapacitated from smoking marijuana or drinking vodka that he was unable to purposefully and intentionally engage in the actions that led to the kidnapping. No. The victim Tatiana's testimony started on page 879, and it recounts the defendant's actions that led to her being restrained and held back in his apartment. It began with Christine being mad and dumping the contents of her bag, including and then taking all of this 14-year-old girl's money and her phone charger and saying, you're free to leave, but remember, he knows that this is her first time in the Bronx. She's from New Jersey. She doesn't know where she is, does not know how to get back to where she came from, and he took all of her money. So this is not a phrase that was said in good faith. Additionally, Tatiana then went straight into the bedroom to cry, and he follows her, and when he goes into the bedroom, he goes and immediately grabs his gun, points it at her head, tells her to stop crying, lie down on the bed, and then forcibly rape her. After that, the defendant unloaded the clip of the gun to show her there are, in fact, bullets in that gun. The threat was very real. So when, in your mind, did the kidnapping begin? No, I, there isn't, based on the fact that we have conceded in this brief, for the purpose of this argument, that the text messages that lured Tatiana over to the defense department are, you know, that we are not relying on those as the income of the interstate. Right, that's, I'm just trying to figure out when it begins. Is it when the door closes behind her, or is it some other point while she's there? When does it start? It starts when the, when, it starts at least when Tatiana says, I want to go, and the defendant then prevents her from leaving by not giving her the ability to, by taking away her ability to leave, really, and then by using a gun to scare her from leaving, to, and by the way, the defense counsel or the public counsel talked about this fact that he took. He did go into the shower, but he asked, but he had the presence of mind to bring the victim into the bathroom with her, took her phone, put it on the legroom of the theater, and told her, don't touch that phone. And this is immediately after the defendant pointed a gun at the victim and raped her. So there's a little question as to why she did not feel free from being kidnapped. Can you speak a bit to the argument that opposing counsel makes about the Constructive Amendment and the prejudicial variance? Was he, in fact, prejudiced because of the variation in the indictment on us to kidnapping? No, Your Honor. The evidence in the government relied now for the interstate nexus, the massive text messages between the defendant and his co-conspirator, Kaja. Those were excerpted nearly in full in the complaint that was used to charge the defendant that began this case. And so those text messages were clearly included and clearly put into non-notice, that those text messages were important to the government to prove that there was a self-conspiracy element to this kidnapping. In fact, in describing those text messages, the government in the complaint described those text messages as messages to a co-conspirator. And so there's plenty, I mean, plenty of notice for, since the beginning of this case, that the government intended to highlight those particular text messages as messages that were in furtherance of the kidnapping. And so there's simply nothing to suggest that there was any element of surprise as to the defendant, as to those particular text messages. And furthermore, as this Court had held in D'Amelio, the essential element here, the question on whether or not there was prejudice is whether the defendant was not put on notice or whether, for some reason, the proof was so different from what was might fail to attach. And there's just no question of that here. Thank you. Thank you. And I've got a question about the text message. Have we, as a Court, found federal jurisdiction on the basis of a single text that was as vague as this one is? Your Honor, I disagree with the premise of that question. OK, please. And it's not simply a single text message. It was a 41-second phone call that preceded that text message. There was a send-off message asking the judge's agent to call me. And even the text message that came after Tatiana fled, come now, that can also be considered as part of a useful interstate facility in order, in furtherance of the crime, perhaps help them to cover up the crime. OK, so you argue the phone call beforehand, the text, and then after she had left. You think those are all part of the interstate facility? All of the furtherance of the kidnapping, yes, Your Honor. And is there a case or authority that you have that supports that kind of reading? Yes, Your Honor. In this court's decision in U.S. v. Obama, that is a 622 Federal Amendment 29. In that case, the— I'm—you can move on. I'm familiar with this. Thank you. Great, thank you. Unless there are any other further questions, I can address the sentencing. Well, yes, I'd just like to be clear. With respect to the use of an interstate facility, you're relying only on the telephone, the 41-minute telephone, the long telephone call whose contents are unknown, and one text which says, call me? No, Your Honor. The telephone call is 41 seconds. 41 seconds. 41 seconds. The text message saying, call me, and also the text message that says, come now. Come now. Come now, which is after her escape. That's right, Your Honor. Now, I will also note that— So, would you address particularly the call me? Yes. You know, the call me—and I can just talk about the timing here. I think that'll put things into a bit more perspective. But, you know, the testimony established at around 10.30 p.m., Tatiana says, I want to go home. About 15 minutes later is when the defendant takes out the gun and points it at her head and forcibly raises her. And the victim continues to cry, of course, after this happens. And at 10.58 is when that outgoing phone call occurs to Shantandra. And about two minutes later, he texts her again to say—to call him. Now, this is right in the smack, in the middle of the kidnapping, right after the most egregious event occurs. She's still crying. She's inconsolable, as is to be expected. And we've already established in the record that Shantandra is somebody that the defendant counts on to help them to entice and to control the death. And so those—that phone call, those text messages asking her to come is—can be—a reasonable inference to be drawn that those text messages and that phone call— And this is—furthermore, this is her day off. Is that right? She's—she—she was not supposed to be working that day. Yes, according to the text messages from Shantandra. Nonetheless, the defendant was keeping her in the loop the whole night, asking—and repeatedly asking her out to come. And in fact, earlier that evening, told Tatiana that Asia, who works for him, and the jury confirmed that Asia, the same person as Shantandra in the text messages, was going to come and help—and help. All right. Thank you very much. We'll hear from Mr. Marengolo for three minutes. Your Honor, I did not have to call for that. No? All right. Well, that's your prerogative, certainly. Okay. Thank you both. We will reserve decision. Thank you.